## BEN WILLIAMS v. THE STATE.

1. INDICTMENT.—If the requirements of the Code of Criminal Procedure are complied with in an indictment, and if it is sufficiently definite to enable the accused to prepare for his defense, and to plead the judgment in bar of another prosecution, it will not be held bad because it does not follow precedents.

2. MURDER.—It being proved that deceased was shot in the leg, at his own house and in the presence of his family, and that his leg was amputated twenty days afterwards, and death ensued in thirty hours; and it being controverted whether the death resulted from the wound or from neglect, the court below charged the jury as follows: "If it be shown that defendant shot the deceased in his leg, inflicting an injury which might not have proved fatal, yet, if defendant willfully failed or neglected to call in a physician, or procure nurses or other attendants, and that said injury caused deceased's death in consequence of said failure or neglect, the defendant shall be deemed equally guilty as if the injury were one which would inevitably lead to death." *Held*, that this instruction accords with Article 542 of the Penal Code; and that the presence of deceased's family, when he was shot, did not exempt the case from the operation of the latter clause of that Article, providing that if the inflicter fails to furnish aid to the party injured, and death ensues from a wound not necessarily fatal, he shall be deemed equally guilty as though the wound had necessarily been fatal. Pasc. Dig., Art. 2204.

3. SAME.—If a wound was so inflicted as to render the inflicter criminal, and death follows, he is amenable for homicide, though the person wounded would have died from other cause, or from the wound irrespective of such other cause, provided the wound really contributed mediately or immediately to the death.

4. PERMISSIBLE HOMICIDE IN SELF-DEFENSE.—A person assailed must decide for himself, but at his legal peril, whether the circumstances of the assault warrant such apprehension of immediate danger to his life or limb as to justify him in killing his assailant. Threats of a dangerous man, when unarmed and doing nothing indicating execution of his threats, do not warrant such apprehension.

5. CHARGE OF THE COURT.—If the evidence makes a case which is either murder or justifiable homicide, it is not necessary or advisable to give in charge to the jury the law of manslaughter, inasmuch as such a charge would not be applicable to the facts, and might mislead the jury.

APPEAL from the Criminal Court of the city of Calvert. Tried below before the Hon. N. W. BATTLE.

The indictment was filed on December 21, 1875, and the case came to trial in the court below in February, 1876, shortly before the abrogation of the special criminal courts by the Constitution of 1876, which became operative on April 18th of that year.

C. H. Bowles, the first witness for the state, knew Sam Middleton in his life-time, and knew he was dead. Deceased was shot in the leg, and an inch or two above the ankle, about September 15, or 18, 1875. His leg was amputated about twenty days afterwards, and he died about thirty hours after the operation. Witness could not say that his death was the effect of the wound, but stated that he was not able to work after he was shot. Dr. McLendon visited him twice, and performed the amputation. Witness sent for several doctors as soon as the injury was inflicted, but they did not come. McLendon's first call was on the fourth day after the deceased was shot.

Julia Middleton, the widow of the deceased, testified that the accused came to the residence of the deceased and shot at him in his yard. His first shot missed the deceased, and the latter cursed at him. Just at that time witness was round the house, and did not hear what was said by the deceased and the accused. The accused used a pistol, and his second shot hit the deceased on the bone of his ankle. The accused then broke and ran. Two men carried the deceased into the house and put him on the bed. He never got out of bed afterwards. Witness waited on him after he was shot. Witness was near him when he was shot. He was standing still, with his pipe in his hand, and his side toward the accused, who was about ten yards distant and facing the deceased. The deceased had no pistol, but in the house he had a gun. Before the accused shot he said to the deceased, "I dare you to move; I will kill you." Mr. Bowles sent for a doctor when the deceased was shot; the accused did not send for any, so far as witness knows.

Dr. Welch came first, and wanted to cut off deceased's leg with a hand-saw. Three days afterwards Dr. McLendon came and put the leg in a box, and about a week after that he came again and cut it off. The shooting took place on a Monday morning, just after sunrise.

Rena Canada, for the state, testified that she was standing in the door of deceased's house when the accused shot him with a pistol. The accused fired two shots, one of which hit the deceased and he fell to the ground. Witness did not hear the deceased use any oaths to the accused.

Dr. John McLendon, for the state, testified that he was a practicing physician at Calvert in 1875, and was called to see a negro man named Sam Middleton, and found him with a gun-shot wound in his leg. The bone of the leg was fractured half-way from the ankle to the knee. It was a compound fracture. Witness found the man in good condition and doing well, and was then of opinion that he would recover if properly cared for. Witness put the limb in a box which he made for the purpose. Some days afterwards witness found the man in a very low condition; the wound was suppurating, and witness was obliged to amputate the limb. Witness was informed that the man died soon afterwards. In witness' opinion the amputation was necessary. It is not possible to say whether a wound of this character be mortal or not. There are many causes why gun-shot wounds prove fatal, such as general bad health or lack of attention. In the present case it is very hard to decide the cause of the death. At witness' first call, it was his opinion that deceased would recover and have the use of his leg, if proper attention was given him and witness' directions were observed; and witness could not say whether he died from the wound or from the amputation. The wound alone was not, in the opinion of witness, necessarily mortal.

Nora Williams, for the defense, stated that she was the wife of the accused, and knew the deceased in his life-time.

On a Sunday night, in 1875, witness and her husband were in their bed, and a man named Nelse Echols in another bed in the same room, when, some two or three hours before day, the deceased broke into the house, and went to the fire-place and took some bread out of a skillet, and then seized the skillet by the handle and struck the accused three blows with it on the head, as hard as he could. At the first blow witness sprang out of bed and cried out murder, and did all she could to stop the accused, who, as soon as he struck the last blow, went out of the house. The head of the accused was cut open in two places by the blows, and he was so badly hurt that he could not get out of bed for an hour. When he got up he went out of the house, but where he went to witness could not say.

Berry Edwards, for the defense, stated that one Monday morning, in September, 1875, the deceased came to his house and told him that the accused had shot his dog, and he intended to kill the accused if it was the last thing he did. Deceased then went away. About sunrise, the same morning, the accused came to witness' house and asked for his pistol, which was then in possession of witness and was loaded. After witness gave the accused his pistol the accused said that some one had come into his house and beat him over the head with an iron skillet; and witness informed accused that the deceased said he intended to kill him, and had told witness that he had been to the accused's house that night. The accused was cut in the head, and had it tied up in a cloth, and there was blood on his face, neck, and shirt. The accused went away, and soon after-wards witness heard two shots, and went up to the house of the deceased and found him shot in the leg.

Nelse Echols, for the defense, confirmed Nora Williams' account of the attack on the accused, in the latter's house, the night before the shooting.

John Westley, for the defense, testified that he lived on

the same plantation and in the same yard with the deceased, in 1875. On the morning of the shooting the accused came to witness' house and they had a talk. The accused was not angry, but was frightened. He went from witness' house towards that of the deceased, and witness followed him. The deceased was standing some twenty steps from his door, and the accused went up to about fifteen steps of him, and said, "Sam, why did you try to kill me last night?" The deceased replied, "Yes, G—d d—n you, I did try to kill you, and I will kill you, if it is the last thing that I do." At this time the accused was standing still. When the deceased said he intended to kill accused he was advancing towards the accused, with his right hand in the pocket of his pants. The accused then put his hand behind him and drew out a pistol, and said to the deceased, "Don't you come any closer to me." The deceased continued to advance, and the accused fired his pistol, missing the deceased with his first shot, and hitting him in the leg with the second. The deceased fell to the ground, and the accused walked away. While the fuss was going on, witness was standing about ten steps from the parties. Julia Middleton was behind the house until after the first shot. The deceased had his hand in his pocket all the time. He was a dangerous man, and would carry out any threat he made. All the people on the plantation were afraid of him.

On cross-examination this witness testified that when the accused came to his house he said to the witness, "John, what do you think? Sam tried to kill me last night." Witness said, "Did he?" and he replied, "Yes, and I am going to ask him what he means by it." Accused had no pistol in his hand at witness' house. Witness did not see the deceased have a pipe in his hand or mouth while the fuss was going on, nor see him have any pistol.

Two other witnesses for the defense proved that the deceased was a dangerous man, likely to execute his threats.

The jury found the accused guilty of murder in the second degree, and allotted to him twelve years in the penitentiary.

*Edward C. Saltmarsh*, for the appellant. The first error assigned—viz., "that the court erred in refusing the instructions asked by defendant's counsel, Nos. 2 and 3"—presents the general principle that the intent or motive is always essential to give a corporal act its criminal quality. The act being proved, and the result of the act also proved, the only remaining question is, With what intent was this act committed?

In homicide, the act being proved, and death also proved to have resulted from the act, the law presumes malice. This presumption arising, the former presumption of innocence, with which the law clothed the accused, departs, and he is now called upon to show affirmatively that he was actuated by an innocent motive; that he had no wicked or mischievous intention of the mind at the time that he committed the act, thereby divesting the act itself of its criminal quality. It is now his duty to show the *quo animo* to the jury, who are now to institute any inquiry into the facts and circumstances that the accused presents in evidence, that go to make out the justification, legal excuse, or extenuation of the act, and from them, in connection with the other facts and circumstances proved, ascertain the actual motive that prompted the accused to commit the act.

Now, a previous threat to kill the accused, when recently uttered by the person killed, against the accused, is a fact. A previous and recent act of violence committed upon the accused, by the person killed, is a fact, and when threats are so made and acts of violence committed, and especially when recently committed, they naturally affect the mind of the person so threatened or assaulted; they are, therefore, material facts, and the circumstances attending them mate-

rial circumstances; therefore they should be proved, and the jury instructed to consider and weigh them in determining the decisive question of intent.

We do not desire to be understood as contending that threats to kill or do other serious bodily harm, when made preceding the act, by the person assaulted, against the accused, when unaccompanied by acts that produce in the mind of the accused a reasonable expectation of death or other serious bodily injury, are sufficient by themselves to excuse or justify homicide. What we would urge is this: That the fact of threats to kill accused, or do other serious bodily harm, when recently made and communicated to accused, before the act, and recent acts of violence committed, by the person assaulted, upon the accused, preceding the act with which the accused stands charged, are material facts to be considered by the jury, to enable them to rightly determine the actual motive and disposition of the mind of accused at the moment that he committed the act. The antecedent threats and acts of violence committed by the deceased against the accused being one connected chain of facts and circumstances, and part of the *res gestæ*, these facts and circumstances being in evidence, justice to the accused demanded that the court should have applied the law to them in the charge to the jury.

The charge of the court given under the head of instruction No. 11, although not exceptionable in itself, was too indefinite to convey to the jury the law governing the evidence presented and relied upon by appellant to justify and legally excuse the act. The instructions refused, we submit, were applicable to the legitimate deductions that the jury were warranted in drawing from the facts therein recited, and proved on the trial; therefore the charge of the court was incomplete.

Therefore we urge that the refusal of the court to charge the jury as requested in the instructions Nos. 2 and 3

worked to the prejudice of appellant, by depriving him of this evidence through which to present to the jury, in its true light and in its full significance, the actual motive and disposition of his mind that prompted him, at the moment, to fire the pistol at deceased.    Burrill on Cir. Ev. 49, 342 ; *Henderson* v. *The State*, 12 Texas, 532 ; *Johnson* v. *The State*, 27 Texas, 766, 768 ; *Lander* v. *The State*, 12 Texas, 480–484 ; *Munroe* v. *Georgia*, 5 Ga. 85 ; *Myers* v. *The State*, 33 Texas, 542 ; *Stokes* v. *The People*, 53 N. Y. ;. Pasc. Dig. of Dec., Art. 11,721 ; *Howell's Case*, 5 Ga. 427 ; *O'Connell* v. *The State*, 18 Texas, 344 ; *Jones* v. *The State*, 13 Texas, 175 ; Roscoe's Cr. Ev. 21 ; *Farrer* v. *The State*,. 42 Texas, 273–275 ; *Marshall* v. *The State*, 200.

The 2d assignment of errors—viz., " that the court erred in overruling the motion of defendant for a new trial, on the ground that the verdict of the jury was contrary to the law and the evidence "—presents the important question, Was the *corpus delicti* established by clear and unequivocal proof ?

We respectfully submit that the state failed, on the trial,. to establish the *corpus delicti*.

That the cause of death, in homicide, must be proved by competent and satisfactory evidence, and that the *corpus delicti* is the first leading fact to be so established, is too. plain a legal proposition to require argument.

It was not enough for the state to prove that the deceased had received a wound, and that appellant had inflicted said. injury, unless the wound was in itself necessarily mortal, and death the immediate result ; these facts being proved, the cause of death would have been legally established.

But, if the wound was not necessarily mortal, and death. did not immediately result, then, and in that event, the state must establish the *corpus delicti* by other competent and satisfactory evidence.

In this case evidence was introduced by the state to prove

the cause of death. It was established that appellant shot and wounded deceased on the leg, that about three weeks after this limb was amputated, and that in about thirty hours after the operation Middleton died:

Dr. John McLendon, the surgeon who performed the operation, says: "I found the patient in good condition and doing well;" that he put the limb into a box and left directions; that some days after, upon visiting deceased, he found him in a very low condition; that he was of the opinion that this "very low condition" was the result of the neglect to carry out the treatment ordered at the first visit. The doctor says, in his opinion, if the treatment had been carried out, "Sam would recover, and have had the use of his leg;" that he "cannot now say whether he died from the wound or from the amputation;" and also that he does not know the cause of death.

This evidence unquestionably leaves this important question in doubt; for no one can assume from the evidence, with any degree of reasonable certainty, that the wound, or the amputation, or the neglect of the nurse or attendants to obey the surgeon's instructions was the cause of the death of Middleton.

It will be observed that the opinion of the surgeon was not accompanied by a statement of the facts upon which his opinion was founded. *Cooper* v. *The State*, 23 Texas, 337.

The cause and manner of death in this case being unknown (no *post-mortem* examination of the body being had, or inquest held), it was impossible to prove the cause of death without resorting to the evidence of medical experts, whose opinion, founded on the evidence of the character of the wound, the treatment of the same, the physical condition of deceased at the time he was wounded, the effect of the amputation at the time it was performed—in short, all the facts and circumstances attending his case, in any manner likely to affect the physical condition of the patient,

being presented in evidence, the jury, with the aid of the opinions of scientific medical experts, would have been enabled to rightly determine this important question.

The evidence presented by the state is insufficient to establish the cause of death, because, assuming all of the facts that are proved by the foregoing evidence to be true, some other hypothesis may still be true. This evidence does not exclude every reasonable doubt as to the cause of death; and, as long as a reasonable and well-founded doubt, growing out of the evidence, or from the want of evidence, as to the cause of death, existed, the *corpus delicti* was not established, and therefore the verdict of the jury was in this case contrary to the law and the evidence, and the refusal of the court to grant appellant a new trial was error.

Burrill on Cir. Ev. 120, 678, 734–737; *Algheri* v. *The State*, 25 Miss. 584; Roscoe's Cr. Ev.; *R.* v. *Hindmarsh*, 2 Leach, 571; *Cooper* v. *The State*, 23 Texas, 336, 339; *Elizabeth* v. *The State*, 27 Texas, 332; *Com.* v. *Webster*, 5 Cush. 317, 318; *Shelton* v. *The State*, 34 Texas, 666; *Perkins* v. *The State*, 32 Texas, 111; 2 Beck's Med. Jur. 898; 2 Greenl. on Ev. 604; *Wilson* v. *The State*, 41 Texas, 320; Wills on Cir. Ev., ch. 7.

*John B. Rector*, also for the appellant.

*H. H. Boone*, Attorney General, for the State.

ECTOR, P. J.   The defendant, Ben Williams, was indicted and tried in the criminal district court of the city of Calvert, in Robertson county, for the murder of Sam Middleton. He was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for twelve years. A motion for new trial was made and overruled, and the defendant took an appeal.

The assignment of errors filed in the lower court presents two questions:

1st. The ruling of the court in refusing to give certain special instructions asked by the defendant.

2d. The action of the court in overruling defendant's motion for a new trial.

The counsel for the defendant has raised a question as to the sufficiency of the indictment, for the first time in this court. His objection to the indictment is that it does not charge that the defendant gave the mortal wound. This objection is, we think, not well taken. The indictment does not follow in all respects the precedents laid down by Mr. Wharton. It leaves out some words used in the precedents. We believe, however, it is good. It contains the nine requisites prescribed in Article 2863 of the Code of Criminal Procedure (Pasc. Dig.), and sufficiently defines the offense to enable the accused to prepare for his defense, and to plead "previous conviction or acquittal" under it of the same offense.

The 10th subdivision of the charge of the judge is as follows : " If it be shown that the defendant shot deceased in his leg, inflicting an injury which might not have proved fatal, yet, if defendant willfully failed or neglected to call in a physician, or procure nurses or other attendants, and that said injury inflicted by the shot caused deceased's death, in consequence of said failure or neglect, defendant shall be deemed equally guilty as if the injury were one which would inevitably lead to death." This instruction is in accordance with Article 2204, Paschal's Digest. The counsel for the defendant contends that the latter part of Article 2204 has no reference to a case like the present, where the deceased was shot down in the midst of his family and friends, and that the error in this charge was not cured by charges subsequently given. We believe that said Article 2204 is applicable to all cases, and that whether the deceased was at home or abroad when he was shot can make no difference.

On this branch of the law the court further instructed the jury that, "where a surgical operation is performed in a proper manner, and under circumstances which render it necessary in the opinion of competent surgeons, upon one who has received a wound apparently mortal, and such operation is ineffectual to afford relief and save the life of the patient, or is itself the immediate cause of death, the party inflicting the wound will, nevertheless, be responsible for the consequences."

The court also gave this charge, which was asked by the defendant, viz. : " If the jury believe from the evidence that the defendant did not willfully fail or neglect to call in a physician or procure nurses, or if such assistance was procured, and the wound received by deceased was not in itself mortal, but from gross neglect on the part of his physician or nurses death resulted, the prisoner cannot be convicted of murder."

The general rule of both law and reason, independent of said Article 2204 of our Code, is that, whenever a wound is inflicted under circumstances which render the party inflicting it criminally responsible, if death follows, the person inflicting the wound will be held responsible for the homicide, though the person wounded would have died from other causes, or would have died from this one had not others operated with it, provided the wound really contributed mediately or immediately to the death.    Mr. Bishop lays down the correct rule of law on this question, in which he says: " The doctrine is established that if the blow caused the death it is sufficient, though the individual might have recovered had he used proper care himself, or submitted to a surgical operation to which he refused submission, or had the surgeons treated the wounds properly. So, also, if the person would have died from some other cause already operating, yet, if the wound hastened the termination of life, this is enough.    But where the wound was

not of itself mortal, and the party died in consequence
solely of improper treatment, not at all of the wound, the
result is otherwise. This last proposition, however, is
practically dangerous, because, in law, if the person dies
by the action of the wound and by the medical or surgical
action, jointly, the wound must clearly be regarded suf-
ficiently a cause of the death. And the wound need not
even be a concurrent cause, much less need it be the next
proximate one ; for, if it is the cause of the cause, no more
is required." 2 Bishop's Cr. Law, sec. 680, and cases
cited in notes ; 1 Hale P. C. 428 ; 3 Greenl. on Ev., sec.
139 ; 1 Russ. on Cr. 505.

The shooting of deceased by defendant, and the inflicting
thereby the wound on the leg of the deceased, are clearly
proved. The first physician called in wanted immediately
to amputate the leg. The second physician, Dr. McLendon,
though he thought at first he could save the leg notwith-
standing it was a compound fracture, some days after his
first visit found the deceased in a very low condition, the
wound suppurating, and was obliged to amputate the limb.
This physician also says : " In my opinion the amputation of
the leg was necessary to save his life." There is no proof
that deceased was neglected or unskillfully treated.

The counsel for the defendant, in his brief, insists that the
11th instruction given by the court, on the subject of self-
defense, does not present the real pivotal point of the case,
to wit, the impression made on the mind of defendant by
the conduct of the deceased. This charge, as given, is as
follows : " Homicide is permitted in the necessary defense
of one's person. If, therefore, the jury believe from the
evidence that the deceased made an unlawful attack upon
defendant, producing in his mind a reasonable expectation or
fear of death or some serious bodily injury, and that the
defendant shot and killed deceased under said circumstances,
in defense of his person, you will acquit him."

The court further instructed the jury as follows : " The defendant is presumed to be innocent until his guilt is established by the evidence, to the satisfaction of the jury, and in case of a reasonable doubt as to his guilt he is to be acquitted."

No bill of exceptions was taken by the defendant to the charge of the court, or to its ruling in refusing certain instructions asked by the defendant.   The court properly opened up every avenue to the defendant, in admitting all the testimony offered by him that could possibly have any bearing in defendant's favor.

He was allowed to prove that Sam Middleton, the deceased, went to the house of defendant two or three hours before day, on the night preceding the shooting, forced open the door, and with an iron skillet assaulted the defendant when asleep in his bed, inflicting on his head two severe wounds ; that on the very morning of the shooting the deceased threatened to take the life of defendant, and gave no other reason for it than that deceased had *shot his dog;* which threat was communicated to the defendant before the shooting.   Defendant also proved that Middleton was a dangerous and violent man, who would likely carry out any threat made by him.  About sunrise of the morning on which defendant was assaulted by Middleton, the deceased, as the statement of facts shows, the defendant went to the house of Middleton, after having procured his (defendant's) pistol, and then the fatal controversy occurred ; deceased was shot down in his own yard in the presence of his family.

After a careful examination of the testimony, and the very ingenious brief of defendant's counsel, we believe that the court in its instructions to the jury had already charged the law applicable to every legitimate deduction from the facts, and that the court did not err in refusing to give the special instructions which were asked by defendant's counsel and were refused.   An examination of the authorities cited by

counsel, which have any bearing on this question, show that in those cases some material evidence was improperly excluded, or some erroneous charge was given, and generally the accused was not the aggressor at the time of the homicide.

The assault made upon the accused, the threats made by the deceased to kill the defendant, and the character of the deceased as a violent man—one who would execute any threat made by him—would not justify or excuse the defendant in firing the fatal shot which wounded the deceased. The defendant should have appealed to the law rather than have become his own avenger.

It. is true that one witness who was present when the defendant shot the deceased testified that defendant, on arriving at the house of Sam Middleton, and when within about fifteen yards of the deceased, said to him, "Sam, why did you try to kill me last night?" and that Sam said to Ben, "Yes, G—d d—n you, I did try to kill you, and I will kill you, if it is the last thing I do," and advanced upon the defendant with his hand in his pocket; that Ben then drew his pistol, and said, "Sam, don't you come any closer to me;" that Sam continued to advance, and defendant shot at Sam; that he missed him the first fire; that defendant then fired the second shot, which hit Middleton in the leg, when deceased was ten paces from him.

The other two witnesses who were present at the time of the shooting gave a very different account of the difficulty.

The wife of the deceased says she was near her husband when the last shot was fired; that he was standing still, some twelve steps from the defendant; that he had no pistol, but had his pipe in his hand when he was shot. None of the witnesses present saw any pistol in the hand of the deceased; none was seen on the ground where he fell, and none was seen in his pants-pocket, or about his person, after he was shot.

The jury doubtless believed from the evidence that the

defendant, some three hours after he had been assaulted by Middleton, armed himself, hunted up the deceased, commenced the difficulty, and shot the deceased in revenge for the injury that deceased had previously inflicted upon him.

When one who is without fault himself is attacked by another in such a manner or under such circumstances as furnish a reasonable ground for apprehending a design to take away his life, and there is reasonable ground for believing the danger imminent, and that such design will be accomplished if not prevented, the party so assaulted may promptly act upon such appearances and kill his assailant, to avoid the apprehended danger; and the killing will be justifiable, although it may afterwards turn out that the appearances were false, and there was in fact neither design to do him any serious injury nor danger that it would be done. He must in all such cases decide for himself, at his peril, as to whether the circumstances in which he is placed, and upon which he acts, are such as to furnish a reasonable apprehension of such danger; for that is a matter subject to judicial review.

The right of self-defense is commonly stated in the American cases thus, says Mr. Bishop: "If a person assaulted, being himself without fault, reasonably apprehends death or great bodily harm to himself unless he kills the assailant, the killing is justifiable." 2 Bishop's Cr. Law, sec. 644.

Under our Code, when an unlawful attack is made upon a defendant, and the attack is of such a nature that the defendant has reasonable grounds to believe that he is then in immediate and impending danger of being murdered or maimed by his assailant, he is justifiable in killing his assailant when at the time of the killing some act has been done by the deceased showing evidently an intention to commit such offense; and the defendant in such a case may act promptly, without resorting to other means before killing

his assailant, because in such a case the law presumes a party's safety depends upon his prompt action in killing his assailant. Pasc. Dig., Art. 2226.

And, although the attack may be unlawful and violent, yet, if the act done by the deceased indicated a less degree of personal injury than to murder or maim (or to commit rape, robbery, arson, burglary, or theft at night), then, before the killing can be justified or excused, all other means must be resorted to (except that the party so unlawfully attacked is not bound to retreat before killing his adversary) for the prevention of the injury, and the killing must take place while the party killed is in the very act of making such unlawful and violent attack. Pasc. Dig., Art. 2228.

We are clearly of the opinion that the judge in the lower court was correct in believing that, if the deceased was killed by the accused, the case was unquestionably, as shown from the testimony, either murder or justifiable homicide, and that he acted properly in not charging on manslaughter. Such a charge would not have been applicable to the facts, and would have had a tendency to confuse or mislead the jury.

The motion for a new trial was properly overruled. The case has been carefully tried, and ably defended by the prisoner's counsel. There is a conflict of the evidence. The jury had the witnesses before them, and, as we must presume, after an impartial examination of the whole case, and giving to the testimony of each witness the weight and credibility they believed it deserved, they felt compelled to conclude beyond a reasonable doubt that the prisoner was guilty as found by their verdict. We find no error committed by the court on the trial of the cause, and cannot interfere with the action of the court below in refusing to disturb the verdict.

The judgment is affirmed.

*Affirmed.*